UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEREMY MILLER,

              Petitioner,

    -vs-

STEVEN RACETTE,
SUPERINTENDENT

              Respondent.
_____

**DECISION AND ORDER**
**No. 11-CV-0426(MAT)**

## I.  Introduction

Petitioner Jeremy Miller ("Miller" or "Petitioner"), through counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered January 14, 2008, in New York State County Court, Erie County. Miller was convicted, after a jury verdict, of intentional murder and related charges.

## II.  Factual Background and Procedural History

On October 27, 2006, Petitioner was indicted by an Erie County grand jury and charged with Murder in the Second Degree (New York Penal Law ("P.L.") Law § 125.25(1)), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03(2)), and Making a Punishable False Statement (Penal Law § 210.45).  By the same indictment, Alysia Hawks ("Hawks"), Petitioner's girlfriend, was charged with Making a Punishable False Written Statement (P.L. § 210.45).  The charges arose from an incident on September 16,

2006, in the City of Buffalo, New York, wherein Petitioner shot and killed Steven Austin ("Austin" or "the victim"), and then falsely denied his guilt in a written statement to police.

On September 16, 2006, at approximately 4:00 a.m., Antwoine Brown ("Brown") and James Simpson ("Simpson") were at the Copacabana nightclub located at the corner of Fillmore Avenue and Bradley Street. T.653.[1] An altercation began in the bar and spread to the area outside, involving a large number of people. T.657.

While standing outside the bar, Brown and Simpson saw Austin, a mutual friend of theirs. T.656. Simpson and Austin chatted as Brown stood nearby. T.657. Brown and Simpson observed a heavyset man in a grey hooded sweatshirt retrieve a gun from a vehicle and tuck it into the pocket of his hooded sweatshirt. T.658, 686. After alerting Brown and Austin about the man with a gun, Simpson left the area. T.686.

Brown observed the heavyset man remove the gun from his sweatshirt and fire one shot into the crowd of people congregated outside of the bar. T.658, 671. Brown then ran from the scene but eventually returned with Simpson to find Austin lying on the sidewalk across from the street from the night club. T.661, 690. Austin later died from a gunshot wound to the chest. T.918.

---

[1] Numerals preceded by "T." refer to pages from the transcript of Petitioner's trial.

From a police photo array, Simpson identified a man named Edwin Garner ("Garner"), also known as "Blow", as the shooter. T.707. When Garner was brought in for questioning, he told the police that Petitioner was shooter. T.816-818. At trial, however, Garner testified that he was "not sure if [Petitioner] was the shooter" and that when he attempted to tell the police that he was unsure of the identity of the shooter, he was told that he had already made a statement identifying Petitioner as the gunman. T.862.

After Garner implicated Petitioner as the shooter, the police shifted the focus of their investigation to him. T.659, 821. Austin's friend, Brown, identified Petitioner as the shooter from a photo array, as did Nakeya Roseboro ("Roseboro") and Tammy Donaldson ("Donaldson"). These women knew Petitioner and had been patrons at the bar on the night of the crime. T.659, 821.

Roseboro's and Donaldson's accounts of events were conveyed to the jury only by their prior statements.[2]  According to Roseboro, she was on the sidewalk down the street from the nightclub with Donaldson on the night of the crime. The club had just closed and the patrons had gathered outside on the street. Roseboro saw Austin

---

[2]
    During the trial, Donaldson and Roseboro refused to testify because Petitioner allegedly had made threats against them.  After a hearing, the trial court found clear and convincing sufficient that Petitioner knew of or acquiesced in threats against these two witnesses.  As a result, the trial court permitted the photo array affidavits, police statements, and grand jury testimony of these witnesses into evidence, and did not require Donaldson or Roseboro to testify.

"trying to be the peacemaker" in the middle of an argument. T.728. As she watched, Petitioner, whom she knew as "Swo", removed a gun from his right side and shot Austin. T.728. According to Roseboro, Petitioner, who was wearing a grey and red sweatsuit with a white t-shirt, jumped into the back of a black two-door car which headed toward Broadway. T.737-38. Austin ran across the street and collapsed. T.737. Roseboro did not observe Austin with a gun, and stated that Petitioner was only "a couple feet" away from Austin when Petitioner shot him. T.730. At the time of the shooting, Roseboro had known Austin for three years and Petitioner for about one year. T.731.

Donaldson's statement corroborated Roseboro's observation that Austin was trying to be a peacemaker when he was shot by Petitioner. T.727-28, 730, 733. As the fight appeared to be breaking up, Donaldson saw Petitioner run to a black Dodge Intrepid vehicle parked across the street from the club, reach behind the driver's seat, and retrieve a black handgun. Saying, "Nigger, you are going to die tonight," Petitioner ran into the middle of the street and shot Austin in the chest. Austin ran across Fillmore, and fell to the ground. T.734. Donaldson did not know Austin and did not see him with a weapon. T.735, 736.

After Petitioner shot Austin, he got into the car from which he had retrieved the gun. According to Donaldson, the vehicle headed down Fillmore Avenue toward Sycamore Street, not toward

-4-

Broadway. T.730, 738.   Donaldson had known Petitioner for six years, having attended high school with him. T.738, 739.

Upon learning that police wished to question him with respect to the shooting, Petitioner voluntarily went to the police station on September 28, 2006, without an attorney. T.805. Petitioner told the police that he arrived at the Copacabana a little after midnight. His girlfriend, Hawks, and her friend, Samantha Hendrix, were both there. The three left the bar about 2 a.m., and Samantha drove them all to her house, where they watched television and then went to sleep. T.805. Petitioner denied shooting Austin or being part of any disturbance at the bar. T.806. Hawks gave a statement to the police corroborating Petitioner's statement. T.815.

To rebut Petitioner's alibi defense, the prosecution called Antwane Hendrix, Samantha Hendrix's brother, who testified that he went to the night club sometime after midnight after receiving a call that his sister was drunk. T.885, 902, 906. According to Antwane Hendrix, he drove his sister, Hawks, and some other male or female passengers to the nearest corner. He then got out of the car but did not explain what happened to his sister and the other passengers. T.887.

The jury returned a verdict finding Petitioner guilty as charged in the indictment.  He was sentenced to an indeterminate term of 25 years to life for the murder conviction, a determinate term of imprisonment of 15 years for the weapons possession

-5-

conviction, and a one-year definite term for the false statement conviction, all to be served concurrently.

The Appellate Division, Fourth Department unanimously affirmed the judgment of conviction on April 24, 2009. People v. Miller, 61 A.D.3d 1429 (4th Dep't 2009), lv. denied, 884 N.Y.S.2d 708 (2009). On June 7, 2010, Petitioner filed a motion in the trial court pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 to vacate the judgment on the basis that he was denied the effective assistance of trial counsel. The trial court denied the motion on the merits, and leave to appeal was denied. On March 13, 2011, Petitioner filed an application for a writ of coram nobis in the Fourth Department, arguing that he was denied the effective assistance of appellate counsel. That motion was summarily denied, and leave to appeal was denied.

Represented by counsel, Petitioner filed a timely habeas corpus petition in this Court on May 18, 2011. The Court subsequently granted Petitioner's motion to amend the petition which now includes the following grounds: (1) the trial court violated his Sixth Amendment right of confrontation by introducing the prior statements of Donaldson and Roseboro; (2) the verdict was against the weight of the evidence; (3) the trial court erred in denying a missing witness charge with regards to Samantha Hendrix; (4) the prosecutor committed misconduct; (5) trial counsel was ineffective in failing to call a material witness with potential

exculpatory evidence; and (6) appellate counsel was ineffective. See Amended Petition ("Am. Pet."), ¶¶22(A)-(F) (Dkt. #8). For the reasons that follow, habeas relief is denied and the petition is dismissed.

## III. The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2) (Dkt. No. 8).

## IV. Analysis of the Petition

### A.   Denial of the Right of Confrontation (Ground One)

Petitioner claims that the People's introduction of Donaldson's and Roseboro's sworn statements to the police, their photo array affidavits, and grand jury testimony violated his Confrontation Clause rights. Specifically, he claims that the evidence presented at the Sirois hearing[3] was insufficient to

---

[3]

Under New York law, before admitting an unavailable witness' testimony or statements, the trial court must conduct a so-called "Sirois

Case 1:11-cv-00426-MAT   Document 23   Filed 06/04/12   Page 8 of 37

establish that Donaldson and Roseboro were threatened and that these threats were made at his request, or with his acquiescence.

As noted above, Donaldson and Roseboro were patrons at the Copacabana club, witnessed the shooting, and gave sworn statements implicating Petitioner as the perpetrator. On the morning of jury selection, however, Donaldson and Roseboro appeared in the prosecutor's office pursuant to a subpoena and had informed him that they had been threatened by Petitioner's associates and were afraid to testify. T.443. In support of his motion for a <u>Sirois</u> hearing, the prosecutor related three incidents of threatening behavior allegedly experienced by Donaldson and Roseboro. T.444. The trial court granted the request.

### 1.   The <u>Sirois</u> Hearing

At the hearing, Donaldson testified that on Mothers's Day 2007, she had accompanied Roseboro to a liquor store on Box and Fillmore Avenues, and remained in the car while Roseboro went inside. T.468. Two men approached the car and one pointed a gun to her temple, while the other asked if she knew petitioner. When Donaldson told him no, he asked if she knew "Swo", and she again replied in the negative. T.467. The man asked her to accompany him to Stanton Street "to clear everything up" and asked for her phone

---

hearing", <u>see</u> <u>Matter of Holtzman v, Hellenbrand</u>, 92 A.D.2d 405 (2d Dep't 1983), to determine whether a defendant, by his acts or acquiescence, caused a witness' unavailability.

number. Donaldson gave him a "bogus" number and both men left in a car. T.467-68.

As soon as Roseboro returned, Donaldson told her what had happened. Donaldson also related the incident to her probation officer who advised her to contact Assistant District Attorney Chris Belling ("A.D.A. Belling"), the prosecutor handling the case. T.469-70.

Two weeks later, Donaldson was with Roseboro in Roseboro's car. As they approached a green light at Herman and Sycamore Streets, a car in front of them did not move, and the light changed to red. Two men got out of the car and approached the two women, leaving another man in the car whom Donaldson recognized as "Busy", a member of the so-called "31" gang with which Petitioner was affiliated. T.472. The two other men told Donaldson and Roseboro that their names were on Petitioner's paperwork and they knew that they would be testifying at Petitioner's trial. T.473. Donaldson told the men that they were not testifying and that someone had given their names to law enforcement. The men told them not to testify against Petitioner, and that if they did testify, to say that Petitioner was not the shooter. Id.

Donaldson related a third incident which occurred while she was at a bus stop at Jefferson and Best Streets with Roseboro. Arlee Daniels ("Daniels") and Brent White ("White") stopped to talk to them. Donaldson recognized White as a 31 member and Daniels as

a community organizer. T.475-76. After asking if they were testifying at Petitioner's trial, Daniels requested that they speak to Petitioner's attorney, stating that they "can't put an innocent man in jail." T.475. Donaldson testified that she later contacted Daniels who, along with White, took them to Petitioner's attorney's office accompanied on July 7, 2007, three days before trial was to commence. T.476, 479. Daniels told them they could change their statements if they felt that they were mistaken regarding the shooter's identity. T.478. Donaldson recalled that she gave a taped statement to Petitioner's attorney which was false, and that she did so because she was scared and did not want to be harmed. T.478.

Roseboro's testimony at the <u>Sirois</u> hearing corroborated that of Donaldson's regarding the three incidents of intimidation by associates or acquaintances of Petitioner. <u>See</u> T.512-18. Like Donaldson, Roseboro felt pressured and scared into giving a false statement to Petitioner's attorney, denying that she had seen anything on the night of the shooting. T.520-21. Roseboro testified that she reported the liquor store incident to her probation officer who advised her to call the police, who responded by saying that they would send a car to circle the block and check on her and Donaldson. T.529-30. Roseboro noted that she felt a little pressure from Daniels because of his status in the community, and that by the time Daniels approached her, she "just wanted out of everything" because she was afraid. T.538-39.

A.D.A. Belling testified that at the grand jury in October 2006, Donaldson was forthcoming and had a good recollection of the events. T.542. She emphasized that she knew Petitioner from school and had no doubt that he was the shooter. T.543. After Donaldson reported the threats on May 23, 2007, he noted a change in her demeanor and that she became difficult to contact. T.546. When he finally tracked her down and brought her into his office, she told him that Petitioner's "people" were around all the time on the street, and that she felt pressured and feared for her life. T.546.

A.D.A. Belling testified that on July 10 or July 11, 2007, he also met briefly with Roseboro who confirmed Donaldson's description of the threats. Roseboro told him that she was terrified that the men who made the threats would kill her if she testified against Petitioner. T.547. When A.D.A. Belling reviewed with Donaldson the statement she provided to defense counsel, Donaldson told him that she did so because of the threats, hoping that would not need her as a witness if she contradicted her testimony. T.555.

Daniels, one of the men whom Donaldson and Roseboro claimed had pressured them to speak to defense counsel, testified for the defense. Daniels, who had grown up with Petitioner's father, had been contacted by Petitioner's friends who told him that they had "run into" Donaldson and Roseboro. According to Petitioner's friends, Roseboro and Donaldson gave the impression that they had

been pressured by the police into identifying Petitioner as the shooter. T.560. Daniels, a part of the Stop the Violence Coalition, indicated that "31" was the number of a local elementary school, and that "31" merely referred to a group of men from that area who grew up together and continued to be friends. T.565, 569.

The trial court issued a ruling from the bench, making extensive findings of fact. See T.600-06. In particular, the trial court found both witnesses "credible and their professed fear both obvious and legitimate". The court concluded that there was "sufficient evidence to establish that the threats and other acts of intimidation . . . obviously designed to pre[v]ent their giving testimony against defendant Miller at trial." Their recanting statements were "incredible" in light of the evidence set forth at the hearing, according to the trial court.

With regard to the alleged intimidation of Donaldson and Roseboro by the police, the trial court likewise found that to be not credible, since both women "came forward on their own after discussing what they had seen individually with their respective probation officers", and that "[t]here was no evidence presented of any pressure, threats or promises from the police to coerce the original statements from these witnesses."

The trial court determined that the prosecution had adduced sufficient proof to link these threats and other acts of intimidation to Miller or to others on behalf of the defendant with

his knowing acquiescence. In each of the three specific instances described by Donaldson and Roseboro, "the people involved in the threatening or intimidating behaviors had some connection to the defendant Jeremy Miller, either as a member of [the] 31 [gang] or a friend of his family." Miller's complicity, or at least his knowing acquiescence in this course of conduct by his associates, was established by Donaldson's testimony that one of the men who approached her said that he obtained their names from defendant Miller's court papers.  The trial judge found that "[t]he source of these court papers could only be the defendant or his counsel, and [he] [did] not believe that defense counsel would disseminate these important papers to strangers to these proceedings."

In addition, the timing of the three contacts coincided with significant stages of Miller's trial; for instance, the "first threatening incident took place very shortly after it was confirmed that the defendant was actually on the verge of trial[.]" Significantly, no further contacts with Donaldson and Roseboro were reported after the witnesses gave their recanting statements to defense counsel. Noting that it properly could consider "circumstantial evidence and all logical inferences that flow therefrom in making a determination in this case," the court found that "all of these facts, taken together, clearly and convincingly link the defendant Jeremy Miller, through his associates, to the

threats and acts of intimidation against Tammy Donaldson and Nakeya Roseboro." T.606.

### 2.   The Appellate Division's Ruling

The Appellate Division rejected the Confrontation Clause claim on the merits, finding that "[t]he People established that the witnesses were unavailable based on the misconduct of individuals acting on defendant's behalf, with defendant's acquiescence" and that "the People presented circumstantial evidence that threats made to the witnesses were in fact made at defendant's request." Miller, 61 A.D.3d at 1429 (internal citations and quotations omitted). Petitioner can only obtain habeas relief if he can demonstrate that the Appellate Division's holding was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1), regarding the Confrontation Clause, or amounted to an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(2).

### 3.   Clearly Established Supreme Court Precedent Regarding the Forfeiture-By-Misconduct Exception to the Confrontation Clause

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST., amend. VI. This right of confrontation is a "fundamental right essential to a fair trial in a criminal prosecution." Pointer v. Texas, 380 U.S.

-14-

400, 404 (1965)). "Testimonial" hearsay evidence-such as prior testimony before a grand jury-may not be admitted against a criminal defendant unless the defendant had a prior opportunity to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 58-59 (2004). However, "[t]he Supreme Court has recognized on several occasions that the right of confrontation may be waived not only by consent, but 'at times even by misconduct.'" United States v. Mastrangelo, 693 F.2d 269, 272 (2d Cir. 1982) (quoting Snyder v. Massachusetts, 291 U.S. 97, 106 (1934); citations omitted); see also Illinois v. Allen, 397 U.S. 337, 342-43 (1970). "[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." Crawford, 541 U.S. at 62 (citation omitted); accord Davis v. Washington, 547 U.S. 813, 833 (2006). In other words, a defendant who "obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." Davis, 547 U.S. at 833; accord Cotto v. Herbert, 331 F.3d 217, 234 (2d Cir. 2003) ("[W]itness intimidation is the paradigmatic example of the type of 'misconduct' that can lead to the forfeiture of confrontation rights.").

In Giles v. California, 554 U.S. 353 (2008), the Supreme Court found that the Confrontation Clause does not expressly provide for an exception "permit[ting] the use of a witness's unconfronted testimony if a judge finds . . . that the defendant committed a wrongful act that rendered the witness unavailable to testify at

trial." Id. at 358. Historically, the Supreme Court observed, the forfeiture rule only applied  "when the defendant engaged in conduct *designed* to prevent the witness from testifying." Id. at 359 (emphasis in original). Thus, it is not enough that the defendant's misconduct may have actually effected the witness' unavailability-the defendant's intent and motivation are critical. In other words, the rule of forfeiture-by-wrongdoing applies in Confrontation Clause cases "only if the defendant has in mind the particular purpose of making the witness unavailable." Giles, 554 U.S. at 367 (quoting 5 C. Mueller & L. Kirkpatrick, Federal Evidence § 8:134, p. 235 (3d ed.2007); other citations omitted). See also Ponce v. Felker, 606 F.3d 596, 597 (9th Cir. 2010) (applying Giles in the AEDPA context).

### 4. New York State Law Regarding Forfeiture by Misconduct

New York state's standard regarding the admissibility of an unavailable witness' hearsay statements, e.g., People v. Maher, 89 N.Y.2d 456, supra, is generally in accord with the Supreme Court's formulation of the forfeiture-by-misconduct exception, e.g., Giles v. California, 554 U.S. 353, supra. Like the United States Supreme Court, the New York courts have accepted the forfeiture-by-misconduct exception to the rule prohibiting admission of an unavailable witness's grand jury testimony if the prosecution shows that "'the defendant procured the witness's unavailability[ through violence, threats or chicanery[ .]'" Geraci,

-16-

85 N.Y.2d at 365 (quotation omitted). In such situations, "the defendant may not assert either the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness's out-of-court declarations[.]" Id. (citations omitted).

As a matter of New York law, the prosecution's burden at a Sirois hearing is to show that (1) the declarant is legally unavailable to give live testimony at trial; and (2) the defendant "either was responsible for or had acquiesced in the conduct that rendered [the declarant] unavailable for trial." Geraci, 85 N.Y.2d at 370. In addition, the New York Court of Appeals has held that forfeiture rule, which it terms the Geraci exception, "cannot be invoked where . . . there is not a scintilla of evidence that the defendant's acts against the absent witness were motivated, even in part, by a desire to prevent the victim from testifying against him in court." Maher, 89 N.Y.2d at 462 (hearsay exception allowing admission of out-of-court statements of declarant whose unavailability is caused by defendant's misconduct cannot be invoked where there is no evidence that defendant's acts against absent witness were motivated by desire to prevent victim from testifying against him in court, especially if it is invoked against defendant in trial for murder of unavailable witness).

In view of the weighty interests at stake in cases allowing unconfronted testimonial evidence to reach the jury, New York has

adopted the more exacting "clear and convincing evidence" standard as the proper standard of proof required to establish a foundation for the admission of hearsay evidence under the forfeiture-by-misconduct rule. Geraci, 85 N.Y.2d at 366 (rejecting the "relatively undemanding 'preponderance of the evidence' standard" adopted by, e.g., the Second and Sixth Circuits); see also id. at 368-69; accord People v. Maher, 89 N.Y.2d at 462.

### 5.   Petitioner's Arguments

Petitioner contends that the state courts unreasonably concluded that the prosecution had met the "preponderance of the evidence" standard used by the Second Circuit in evaluating Confrontation Clause waiver-by-misconduct claims. Petitioner's Reply Memorandum of Law ("Reply") at 8 (citing Perkins v. Herbert, 596 F.3d 161, 166-67 (2d Cir.), cert. denied, 131 S. Ct. 318 (2010)). Although it is true that the Second Circuit utilizes the preponderance of the evidence standard on direct review of criminal convictions, the failure to meet that standard does not mean that Petitioner has proved that the trial court committed a federal constitutional violation.

First, New York's clear and convincing standard is more stringent than the preponderance of the evidence standard. See, e.g., Mastrangelo, 693 F.2d at 272. Second, and more important, Petitioner must establish that the state courts' ruling were contrary to, or an unreasonable application of clearly established

Supreme Court precedent in order to obtain habeas relief under 28 U.S.C. § 2254(d)(1). However, "the Supreme Court has taken 'no position on the standards necessary to demonstrate such forfeiture[.]'" Perkins, 596 F.3d at 167 (quoting Davis v. Washington, 547 U.S. at 833 (noting that federal courts apply a preponderance of the evidence standard, and the tendency in state courts is to do the same). This Court interprets Davis's statement as signaling that the Supreme Court likely would not require a burden of proof more strict than preponderating evidence in these cases. However, even applying the stricter clear and convincing standard utilized by the state courts in this case, it was not unreasonable for the trial court to conclude that the evidence at the Sirois hearing produced an "abiding conviction" that the truth of the pertinent factual contentions was "highly probable." Colorado v. New Mexico, 467 U.S. 310, 316 (1983) (defining "clear and convincing" evidence standard, reh'g denied, 468 U.S. 1224 (1984)).

    As an initial matter, the trial court's extensive factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), and moreover, are amply supported by the hearing testimony. With regard to the "unavailability" element, the evidence was undisputed that both Roseboro and Donaldson were legally unavailable due to their adamant refusal to testify despite the subpoenas issued against them. The second element—that the

-19-

witnesses' unavailability was due to threats and intimidation by Petitioner's associates with his acquiescence–was found by the trial judge to have been established by clear and convincing evidence. In particular, the trial court found, the individuals involved in each of the three instances described by Donaldson and Roseboro had some connection to Miller, either as a member of "31" or as friend of his family. The trial court found that Miller's "complicity, or at least his knowing acquiescence in this course of conduct by his associates," was established by Donaldson's testimony that one of the men who approached her said that he obtained their names from defendant Miller's court papers.  The trial judge found that "[t]he source of these court papers could only be the defendant or his counsel, and [he] [did] not believe that defense counsel would disseminate these important papers to strangers to these proceedings." See Geraci v. Senkowski, 23 F. Supp. 2d 246, 258 (E.D.N.Y. 1998) (judges may "use their common sense in drawing inferences" to make their determination at Sirois hearing). With regard to the motivation element, the trial court reasonably determined that "[o]bviously, the only person who would benefit from these witnesses changing their story" was Miller, and that it was similarly obvious that the threatening acts by Miller's associates was designed to prevent their giving testimony adverse to Miller.

Petitioner also contends that the trial court improperly relied upon circumstantial proof to conclude that persons acting on his behalf, with his knowledge or acquiescence, intimidated Donaldson and Roseboro in order to prevent their testimony against him. In the forfeiture-by-misconduct context, the New York Court of Appeals has specifically approved the use of circumstantial evidence to establish, in whole or in part, that a witness' unavailability was procured by the defendant. Geraci, 85 N.Y.2d at 369 (citation omitted). The Second Circuit has found no "compelling reason why the evidence of 'intentional relinquishment' cannot be circumstantial . . . ." Cotto, 331 F.3d at 234-35. As both state and federal courts have consistently recognized, circumstantial evidence is not inherently weaker than direct evidence. E.g., United States v. Brown, 236 F.2d 403, 405 (2d Cir. 1956). Moreover, as the Second Circuit pointed out in Cotto, "there is no Supreme Court caselaw definitively establishing the circumstances sufficient, or the standard of proof applicable, in analyzing waiver cases under the Confrontation Clause." 331 F.3d at 235. Thus, the state courts' reliance on circumstantial evidence in Miller's case cannot have been contrary to, or an unreasonable application of, clearly established Supreme Court law.

Petitioner argues that there is a lack of evidence unambiguously or expressly linking him to the threats and acts of intimidation. See Am. Pet., ¶ 22A; Reply at 8-14. For instance,

Petitioner argues, the prosecution did not offer any testimony by any law enforcement personnel or expert familiar with gang activity in Buffalo that a criminal group known as "31" existed or was suspected to exist. Pet'r Reply at 12. Whether "31" referred to a gang engaged in criminal activity or simply a group of friends who had attended School 31 is immaterial. The testimony by defense witness Daniels was that 31 was a group of old schoolmates who helped one another, and Petitioner was part of that group. As the trial court concluded, it was reasonable that Petitioner would have relied upon his associates to act on his behalf as they were old friends from the neighborhood, and Petitioner could not personally act due to his pretrial custodial status. See Geraci v. Senkowski, 23 F. Supp. 2d at 258.

Given the extensive federal precedent recognizing that the admission of out-of-court statements is appropriate when a defendant has intimidated a witness, and the absence of "clearly established" Supreme Court law limiting the circumstances that constitute forfeiture by misconduct, the Court cannot conclude that the state courts' determinations were "unreasonable applications" of clearly established Supreme Court law. Cotto, 331 F.3d at 235.

Furthermore, the trial court did not unreasonably determine the facts presented at the Sirois hearing in concluding that Petitioner procured Donaldson's and Roseboro's unavailability through threats and other acts of intimidation designed to prevent

their testimony. The credible evidence and reasonable inferences arising therefrom supported the court's finding that the prosecution proved by clear and convincing evidence that "the witnesses were threatened and intimidated to the point of being unavailable" and that these threats and acts of intimidation were caused by Petitioner for the purposes of preventing them from testifying at his trial. Habeas relief is therefore unwarranted on this claim.

**B.   Verdict Against the Weight of the Evidence (Ground Two)**

Petitioner contends that the verdict was against the weight of the evidence with respect to the second degree murder conviction. The Appellate Division rejected this claim, finding that "the People presented evidence establishing the elements of identity and intent with respect to that count." Miller, 61 A.D.3d at 1430 (internal citations omitted).

A "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, see N.Y. CRIM. PROC. LAW § 470.15(5), while a legal insufficiency claim is based on federal due process principles. People v. Bleakley, 69 N.Y.2d 490, 495 (1987). Because Petitioner's weight of the evidence claim implicates only state law, it is not cognizable in this federal habeas proceeding. See 28 U.S.C. § 2254(a); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (habeas corpus review is not available where there is simply an alleged error of state law). Therefore,

Petitioner's claim is dismissed as not cognizable.  See, e.g., Scission v. Lempke, 784 F. Supp.2d 237, 243 (W.D.N.Y. May 16, 2011) (dismissing habeas petitioner's claim that the verdict was against the weight of the evidence as not cognizable) (citations omitted).

### C.   Refusal to Issue a Missing Witness Charge (Ground Three)

Petitioner asserts that the trial court erred in denying his request for a missing witness charge with regard to Samantha Hendrix. Without specifically discussing this claim, the Appellate Division denied it as "without merit." Miller, 61 A.D.3d at 1430. The AEDPA standard of review applies to this summary adjudication on the merits. See Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) (holding that even where state court fails to precisely specify the claims deemed meritless and why those claims are meritless, "an unexplained ruling on the merits is . . . entitled to AEDPA deference").

In determining whether the failure to give a jury instruction warrants habeas relief, the reviewing court must determine that the petitioner was entitled to the requested charge under state law, that the failure to give one resulted in a denial of his federal constitutional right to due process, and that the state court's contrary conclusion constituted an unreasonable application of clear Supreme Court law. Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir. 2005) (citing 28 U.S.C. § 2254(d)); see also Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001). Under New York law, the initial

burden for a missing witness charge rests on the party requesting the charge, who must demonstrate that the uncalled witness is knowledgeable about a material issue, that the witness would testify favorably to the opposing party, and that the opposing party has failed to call the witness to testify. People v. Gonzalez, 68 N.Y.2d 424, 427 (1986). The burden then shifts to the opposing party to demonstrate either "that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony would be cumulative [of] other evidence, that the witness is not 'available,' or that the witness is not under the party's 'control' such that the witness would not be expected to testify" in favor of the opposing party. Id. at 428.

The Second Circuit, recognizing "the usual aura of gamesmanship that frequently accompanies requests for a missing witness charge," has deferred to the trial court's judgment on this issue. United States v. Torres, 845 F.2d 1165, 1171 (2d Cir. 1988) (internal quotation marks omitted). Thus, in the particular area of "missing witness" adverse inference charges, a trial court's decision will rarely support reversal of a criminal conviction even on direct review. Torres, 845 F.2d at 1171.

During an unrecorded chambers charge conference, defense counsel requested a missing witness charge based on the prosecution's failure to call Samantha Hendrix.   T.928.   The

prosecutor argued that there was no basis for the charge because
Samantha Hendrix was unavailable to him, and was not under his
control. Id. The trial court found that the elements of
availability and control had not been established because the
prosecutor, as an officer of the court, "said that this person is
not available, able to be produced and called as a witness and is
not under the People's control. . . ." T.929. The trial court thus
made a factual determination that there was an insufficient basis
on which to find crucial elements of the missing witness charge,
i.e., availability and control.

"[I]n a habeas proceeding, 'a determination of a factual issue
made by a state court shall be presumed to be correct,' unless
rebutted by clear and convincing evidence." Morris v. Reynolds,
264 F.3d 38, 47 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(e)(1)).
Petitioner claims that Samantha Hendrix was in fact available to be
produced as a witness by the prosecution and was under the People's
control simply by virtue of the fact that she was the sister of
Antwane Hendrix who had testified a day earlier for the
prosecution. This unsubstantiated assertion is insufficient to
overcome the presumption of correctness afforded the state court's
factual determination. Indeed, as Respondent notes, Samantha
Hendrix was equally available to Petitioner: In his statement, he
told the police that he had left the club with her before the
shooting and remained at her home until the next morning.

-26-

Petitioner has failed to demonstrate that the state trial court erred in determining that he was not entitled to a missing witness charge as a matter of state law. Therefore, the Court cannot grant habeas relief on his missing witness charge claim. See Davis, 270 F.3d at 124 (explaining that the first question that must be answered in petitioner's favor in order to grant habeas relief is whether the jury charge required as a matter of New York state law).

### D.   Prosecutorial Misconduct (Ground Four)

Petitioner argues that the prosecutor's summation deprived him of a fair trial. Respondent contends that the claim is unexhausted, but must be deemed exhausted and procedurally defaulted. See 28 U.S.C. § 2254(b)(1)(A). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984), including the highest appellate court from which discretionary leave may be sought, O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999).

Although appellate counsel raised the prosecutorial misconduct claim on direct appeal to the Appellate Division, he did not include the claim in his leave application to the New York Court of Appeals. Petitioner filed a pro se leave application as well, but did not assert the prosecutorial misconduct issue. Both

Petitioner's and counsel's leave applications sought review of the claim involving the missing witness charge and the Confrontation Clause violation. This did not suffice to "fairly present" the prosecutorial misconduct claim to the Court of Appeals. See Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991).

Consequently, Respondent argues, the claim remains unexhausted, but should be deemed exhausted and procedurally defaulted because Petitioner no longer has a state court forum in which to exhaust this record-based claim. See id. at 120-21. The Court agrees. See Spence v. Superintendent, 219 F.3d 162, 170 (2d Cir. 2000) ("Because [petitioner] failed to raise his claim in the ordinary appellate process and can now no longer do so, it is procedurally defaulted.")); N.Y. CRIM. PROC. LAW § 440.10(2)(c) (court must deny motion to vacate raising record-based claims which could have been raised on direct appeal but unjustifiably were not).

Habeas review is only available if Petitioner establishes cause for the default and resulting prejudice, or that a fundamental miscarriage of justice will result from the Court's failure to review the claim. Coleman v. Thompson, 501 U.S. 722, 748-50 (1991)). Petitioner asserts that trial counsel's ineffectiveness in failing to object to the prosecutor's misconduct constitutes "cause" for the default. For a petitioner to assert ineffective assistance of counsel as cause for a procedural

default, the petitioner must first exhaust that claim in state court. See, e.g., Murray v. Carrier, 477 U.S. 478, 489 (1986) ("[A] claim of ineffective assistance [must] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."). Petitioner never properly presented any such independent claim of ineffective assistance of counsel to the state courts and thus he cannot use said claim to constitute "cause" for his failure.[4] See Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).

Additionally, Petitioner asserts ineffective assistance of appellate counsel as "cause" for the default, citing appellate counsel's failure to raise this claim on direct appeal. See Reply at 15-16. This contention also fails insofar as Petitioner's stand-alone ineffective assistance of appellate counsel claim on this basis is meritless, as discussed below. See Edwards, 529 U.S. at 447 (in order to constitute cause, counsel's ineffectiveness must itself rise to the level of a constitutional violation) (citation omitted). Because Petitioner cannot establish cause for the default, the Court need not consider prejudice. See McCleskey

---

[4]     In his coram nobis application, Petitioner claimed that appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim based upon trial counsel's failure to object to numerous instances of prosecutorial misconduct. A coram nobis application, however, is not the appropriate procedural vehicle for asserting and exhausting an independent claim of ineffective assistance of trial counsel. See Congelosi v. Miller, 611 F.Supp.2d 274, 307-08 (citing cases).

v. Zant, 499 U.S. 467, 494 (1991) (failure to make a showing of either cause or prejudice defeats the petitioner's ability to overcome the procedural default on this basis).

Moreover, Petitioner has not demonstrated that this Court's failure to review the claim will result in a miscarriage of justice.  He asserts generally that "[b]ecause the record indicates that an actually innocent person may have been convicted, which would constitute a fundamental miscarriage of justice, [his] claims of prosecutorial misconduct should not be barred."  Reply at 15. To meet the miscarriage of justice exception, however, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Murray, 477 U.S. at 496.  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial."  Schlup v. Delo, 513 U.S. 298, 324 (1995).

Petitioner has offered no new, reliable evidence showing his factual innocence, and therefore he cannot qualify for the fundamental miscarriage of justice exception.  Accordingly, Petitioner's prosecutorial misconduct claim is procedurally defaulted from habeas review and is dismissed on that basis.

**E.    Ineffective Assistance of Trial Counsel (Ground Five)**

Petitioner claims that he was denied effective assistance of counsel because trial counsel failed to call "material witness", Anthony Kitchen ("Kitchen").  According to Petitioner, Kitchen would have identified Garner as the shooter. The Erie County Court rejected this claim on the merits:

> [T]he basis of his contention that counsel should have called Anthony Kitchen to testify that Edwin Garter was the shooter, is not a sworn statement, but consists of the notes of an interview of Kitchen by the police. Moreover, defendant has provided no evidence that his attorney failed to interview Kitchen, and defendant's Exhibit A suggests that counsel determined that Kitchen would not have been a credible witness because of his extensive criminal record.

Erie County Court Order dated 11/21/10, Resp't Ex. D.

To establish ineffective assistance of counsel, a petitioner must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   Id. at 687. Second, the petitioner must show that counsel's deficient performance prejudiced his defense, id. at 692, which requires proving that, "but for" counsel's errors, there was a reasonable probability that the outcome of the proceeding would have been different, id. at 694.

Strickland's standard on direct appeal is already "highly deferential," 466 U.S. at 689, but in the context of a federal habeas proceeding under AEDPA, the habeas court must apply a "doubly deferential judicial review" to a state court's decision on ineffectiveness claims. Knowles v. Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1420 (2009). Where, as here, the state court has adjudicated the merits of the petitioner's claim, and 28 U.S.C. § 2254(d)(1) applies, "the question is not whether counsel's actions were reasonable", but instead "is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 788 (2011).

The decision "whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987), cert. denied, 484 U.S. 958 (1987); accord United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999). Such decisions, "if reasonably made, will not constitute a basis for an ineffective assistance claim." Id. Such tactical decisions generally do not rise to the level of a constitutional violation, and the habeas court may not second-guess trial strategy simply because the chosen strategy has failed. United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987).

Petitioner has never provided a sworn affidavit or declaration from Kitchen setting forth Kitchen's proposed testimony. See Schulz v. Marshall, 528 F. Supp. 2d 77, 96 n.13 (E.D.N.Y. 2007) ("In evaluating claims of ineffective assistance of counsel based on failure to investigate witnesses, courts place weight on a defendant's ability to show that these witnesses would have had helpful information.") (collecting cases). As the motion court pointed out in denying Petitioner's motion to vacate, the exhibit submitted in support of that motion consisted merely of the notes of an interview of Kitchen by the police. The motion court also noted that Kitchen had an extensive criminal record, which would have detracted from his credibility and which supported trial counsel's decision not to put him on the stand.

In any event, even assuming trial counsel had performed as Petitioner wished him to, he still cannot demonstrate prejudice. Petitioner asserts "given the closeness of the case, there is a reasonable probability that the outcome would have been different had defense called Anthony Kitchen as a witness, as he agreed with James Simpson that Gardner was the shooter." Reply at 19.  The Court finds this argument unavailing. Even assuming arguendo that Kitchen had been called to testify that he saw Gardner shoot the victim, the jury was not bound to accept his testimony over that of the four other witnesses who identified Petitioner as the shooter. Thus, the Court cannot find, as Petitioner urges the Court to do,

that there is a reasonable probability that the outcome of his trial would have been different, but for counsel's alleged error.

Accordingly, the Court finds that the state court's adjudication of this claim did not incorrectly apply Strickland. It follows that the state courts did not apply Strickland in an objectively unreasonable manner so as to warrant habeas relief under 28 U.S.C. § 2254(d)(1).

### F.    Ineffective Assistance of Appellate Counsel (Ground Six)

Petitioner argues that he was denied his constitutional right to effective assistance of appellate counsel because appellate counsel failed to (1) argue that trial counsel was ineffective for not objecting to  misconduct by the prosecutor; and (2) raise an argument under Crawford v. Washington, 541 U.S. 36 (2004), in connection with his claim concerning the Sirois hearing. The Appellate Division adjudicated this claim on the merits when it summarily denied Petitioner's coram nobis application. See Harrington v. Richter, 131 S.Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Therefore, the AEDPA standard of review applies.

"Although the Strickland test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the

same test is used with respect to appellate counsel." <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted). In the appellate context, fulfilling the first prong of <u>Strickland</u> requires the petitioner to demonstrate that his attorney "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker" on appeal. <u>Clark v. Stinson</u>, 214 F.3d 315, 322 (2d Cir. 2000). To satisfy the second prong of <u>Strickland</u>, the petitioner must show that but for appellate counsel's deficient performance, there is a reasonable probability that his appeal would have been successful before the state's highest court. <u>Id.</u>

### 1.) Failure to Raise a Claim of Ineffective Assistance of Trial Counsel

Petitioner claims that appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim based on trial counsel's failure to object to numerous instances of prosecutorial misconduct. Miller cannot show that he was prejudiced by trial counsel's failure to preserve the prosecutorial misconduct claim because the Appellate Division considered the merits of the claim, notwithstanding the lack of preservation. <u>Miller</u>, 61 A.D.3d at 1430. Furthermore, appellate counsel cannot be faulted for failing to raise an ineffective assistance of trial counsel claim based upon a meritless issue. Petitioner has failed to fulfill either prong of the <u>Strickland</u> test. It necessarily follows that

the Appellate Division did not unreasonably apply <u>Strickland</u> in rejecting his claim of ineffective assistance.

### 2. Failure to Cite <u>Crawford</u> in Support of His Confrontation Clause Claim

Petitioner claims that he received ineffective assistance of appellate counsel because appellate counsel failed to "argue the issue regarding the denial of [his] right to confront his accusers to include a federal constitutional challenge to the <u>Sirois</u> ruling by not citing the <u>Crawford</u> standard." Pet., ¶22F.

On direct appeal, appellate counsel thoroughly briefed this issue, framing it broadly as a violation of both state and federal constitutions, and the issue gained a merits-based review on direct appeal. The Court cannot find that appellate counsel's failure to specifically cite to <u>Crawford v. Washington</u>, 541 U.S. 36, <u>supra</u>, was professionally unreasonable. Furthermore, Petitioner has not specified how <u>Crawford</u> was apposite to his case or how citation to it would have changed the outcome of his appeal. Thus, Miller has not demonstrated that appellate counsel was deficient under <u>Strickland</u>, and the Appellate Division did not unreasonably apply <u>Strickland</u> in rejecting his <u>coram</u> <u>nobis</u> application.

## V. Conclusion

For the reasons stated above, the amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. #8) is denied, and the amended petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a

constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    June 4, 2012
          Rochester, New York